Good morning, Your Honors. My name is Judith Wood, and I represent the appellant Gui Dong. Gui Dong. Gui Dong is a brave woman who has risen from the ashes of a totalitarian regime where human life is not valued. She suffered an unintentional pregnancy after an IUD was inserted into her inner parts. The IUD caused her pain, but she had no choice in the matter. The pregnancy, however, which happened even though the IUD was there, brought her great joy, and she struggled to give birth to that child. However, the Chinese authorities enforced their one-child policy against her and determined that she had to have an unwanted and undesired abortion. She resisted their orders for as long as she could. She followed their instructions and went to the one-child classes and tried to postpone the eventual abortion. But at last, she went into hiding at her cousin's home, trying to elude the authorities. However, by this time, the pregnancy was visible, and she was forced to have an abortion. She suffered terrible pain, emotional, physical. The issue here is credibility, so why don't you address it? Excuse me? The issue is credibility, so why don't you address that? Well, she testified over and over again and tried to explain what happened during the abortion. I believe that she was badgered and humiliated, actually, during the course of the hearing regarding the facts of the abortion. There's a very important document in this case, and that is a receipt from the hospital. And it's signed. It's rather given to the payee, Ming Pao, who was the applicant's sister-in-law. What happened was after the abortion, in order for her to be released from the hospital, a fee had to be paid. And so the husband sent his sister, her sister-in-law, to pay the fee. However, the immigration judge did not give credence to that receipt, because there was no corroborating evidence about Ms. Ming Pao being her sister-in-law. And so that's crucial evidence of having had the abortion. Anyway, after the abortion, she suffered horrible pain, both spiritual and physical. We do know the facts as you claim them, and there are issues in the case, and I really suggest you address them. We know what her story is. We've read the record. We want to know why you think IJ's adverse credibility determination was wrong. Well, he says himself during the course of the proceeding that the details about some of the dates might be found by the higher court to be not material to the heart of the claim. She testified over and over again as to the consequences and the trail of events that led up to the abortion. It was an unusual situation insofar as she was allowed to remain pregnant for a few months, and she kept forestalling the abortion, telling them she'd have it on her own. Finally, she really wanted this baby, so she hid out in her cousin's house, and I guess she began to show, so they picked her up and forced her into the abortion. However, the judge found the discrepancies, which were not tremendously crucial, he found that they annihilated basically her credibility. So what is her response to that? For example, one discrepancy had to do with the date and the date falling on a Sunday. What's the response to that? Well, she tried to explain. She actually did try to rehabilitate herself. There was some discussion about whether a date fell on a Sunday. She said she worked overtime. She had to do overtime at the factory where she was working. She didn't. See, this is what was strange. She didn't say that, as I would have expected her to say, well, you know, maybe it was the day after. I don't really know the date. But she said it fell on a Sunday, and then he said, well, you mean they came and they did these pregnancy tests on a Sunday? Because that was the rest of her story. This was the day on which they had come to her workplace to do testing. Well, you know, in the United States, Sunday is considered a Sabbath day when people take the day off. That's not the same necessarily. She didn't say that either. She said, I was working overtime. It is a work day in China. She said it was about the 7th. Is that what she said? Right. She may not have remembered the exact date that it occurred on. What about the other inconsistencies that the IJ noted? Well, there are a whole list of inconsistencies. That's what the case is about, ma'am. So that's why I think I really joined Judge Berzon in inviting you to respond to those. However, I believe that none of those inconsistencies go to the heart of the matter. Okay, so let's talk about them, please, one by one. Well, the first inconsistency regards whether or not she had permission from the birth control people to forestall. Really, it all is about her being able to forestall the abortion because the trial attorney and the judge seem to think that if they wanted to force her into abortion, there's no way. That was the judge's basic philosophy. Right. We know the record, so what's the response, please? Well, you know, maybe they allowed her to forestall it for their own policy reasons, thinking that maybe she'd get an abortion on her own. And so I think that's perfectly plausible. She tried to evade their orders and tried to seem as if she was complying with them by going to those classes. She actually did go to the classes. And when she was interrogated during the course of the hearing as to why she went to those classes, she said it was the law. She had to go to those classes. So she wanted to keep them, quote, unquote, happy, so to speak, and have them think that she was actually going to follow through with the abortion. But she wanted this baby, so she went into hiding. Maybe she could have just turned up for a voluntary abortion, but she didn't. She hid out. And that's what really leads to her credibility insofar as it was a forced abortion because she really wanted to keep this baby. What about the Falun Gong issues? Excuse me? It seems to me that the Falun Gong contradictions are perhaps harder to explain. And I assume that if she were found, if the Falun Gong story, would you agree that, or is it so that if there was a reason to not believe the Falun Gong story, you could also not believe the abortion story, or are they separate? Do you want me to discuss her following in Falun Gong, what she did? Yes, but I asked a much more specific question than that. Go ahead, do what you want. Well, I think she turned to Falun Gong as a result of being so depressed, as a result of giving birth to a dead child that she had tried to protect. And so she turned to Falun Gong to try to heal herself, literally and figuratively. She was physically ill, and she was mentally ill by that time. She had fallen into a horrible depression. So the Chinese government came down on Falun Gong followers pretty harshly, and she was arrested on September 8, 1999. And she was kept in jail for 14 days, during which time she was beaten and interrogated. The fact that she was interrogated in order to give a list of other Falun Gong followers falls within the definition of torture. She wasn't just beaten. She was interrogated while she was beaten in custody. She testified that her head was slammed against the wall, and that she was ordered to give names, name names. Then she was arrested again on July 13, 2013. Once again, she was beaten really severely, and accused of having an agenda of attempting to overthrow the Communist government. Her hands were handcuffed to a pipe, and she was detained for 15 more days. And there were more interrogations. Now, the IJ found that she was not credible because of the number of interrogations, but she testified clearly as to the number of interrogations. It's just that the third interrogation was held in a different room, so she didn't think it was formally an interrogation. And that's perfectly plausible. The word interrogation is a term of art. She was questioned three times. I think that the IJ's decision was based on his own view of China, which is not necessarily correct. I don't think he really took into account all the country conditions and the horrible one-child policy, and the fact that Falun Gong followers were not allowed to practice their religion. They were not allowed to practice their beliefs. And then the third and final reason why she should be granted asylum is her conversion to Christianity, which the BIA took issue with as well. Now, we know that she was able to make a connection with Christ while she was in detention in the United States in 2013. Someone evangelized her, and she became knowledgeable about Christ. She was not educated about Christ. That wasn't the problem with that. Again, you're reciting facts. We've read the record for the fourth time. The issue with regard to the motion to reopen, as I understand it, is that she had to prove changed country conditions, and she didn't. Is that right? Was that the issue? Right. Okay. So why did she prove changed country conditions? It is her conversion, which is a change. Is that a cognizable change for purposes of a motion to reopen? Well, the communist government of China has come down very harshly against Christians in the past couple of years and has detained and tortured Christians who do not follow the communist rule about how and where you're allowed to practice Christianity. And so if she were to go back to China now, she would be punished, severely punished, on account of her religion as well as the fact that she's a visible person who has practiced Falun Gong, who has already been arrested. Her motion to reopen was not a timely motion to reopen. Is that right? Could you repeat that question? Her motion to reopen was not a timely motion to reopen. Is that right? That is correct, Your Honor. Okay. So she has to prove changed country conditions. Is that right? The changed country conditions are simply that the Chinese government has come down more severely against. And she has proof of that in the record? There are documents, yes. Can you point me to them? Could you give me the sites for the documents you just mentioned? I don't have it here. Sorry. You're beyond your time. Okay. Really, that's the end of my argument. It's just that I don't think that she'll be safe in China. And the other thing is that I wanted to say this is such a strong refugee case in terms of our own statutes about victims of a one-child policy and our own clinging to freedom of religion, whether it's Falun Gong or Christianity, that it really is a rather thoughtless and careless denial of this person's rights to deny her asylum. I think that the court has to grant her asylum, has to at least remand it, because the original hearing was not sufficient. I did not represent her at the original hearing. I have not filed any kind of lazada motion. But many documents could have been somewhat authenticated, and they were not. Also, her declaration and her testimony could have been presented in a much more concise and reasonable way. But even given the flaws in the record, I think the facts still lead you to conclude that she's eligible for asylum because of the conditions in China, which are clear. There's no doubt about the one-child policy. Is there any question that there was a forced abortion here? Well, she was forced onto her table. She was what, in her fifth month? Fourth, fifth month, right. Fourth, fifth month. Yeah. And she was showing. And they pulled her into a van and then pulled her into a clinic. She obviously was trying. I don't think there's any issue about it. Is there any dispute about those facts? What? Is there a dispute about that, the forced abortion? Is there a what? Is there a dispute? I don't think that that's a dispute in this case. I mean, it's obvious that it was forced. She was trying to evade that. But he says he doesn't believe her. I mean, he says she's not credible. It means I don't believe you, doesn't it? Given all her testimony about how she tried to evade this abortion, avoid this abortion, how could one not believe her? She didn't want the abortion. She tried desperately not to have the abortion. That's why her credibility is the whole case. That's why her credibility is the whole case. That's why we're trying to focus on credibility. And I think we understand your argument. Well, you're saying that none of those inconsistencies went to the heart of her case. Is that right? Could you repeat that, sir? What you're saying is that none of what the I.J. found were inconsistencies went to the heart of her case. Yes, Your Honor. That's exactly what I'm saying. And even he says it in his own decision that the court may find that these inconsistencies What he says is he doesn't understand the exact facts of the abortion, so he's not going to find her credible. But there are so many salient facts in this case that present themselves in glaring light that how could one say that she wasn't forced into an abortion when she tried to escape it for four months? It's not like she... And during the course of the hearing, the trial attorney and the judge interrogated her as to why she didn't get permission to have a second child, and she replied, I tried, I tried to get permission. They wouldn't give it to her. She really wanted this second child. Also, they interrogated her as to her mental health. The trial attorney interrogated her saying, if you were depressed, why didn't you get help before you were dismissed from the job? There was no help available, and she was dismissed from the job because of the forced abortion. So her life basically came to a grinding halt. The only way she could rehabilitate herself at that point, after giving birth to a dead child, was to start this practice of Falun Gong, which is part of her spiritual journey. And when she came to the United States and found out about Christ, she was able to continue that spiritual journey. The fact that she didn't profess her change of religion until 2008 goes to her sincerity, because she didn't formally get baptized until she really understood the religion. She went to Bible study, she went to church with her husband, and it took her a while to really commit to Christianity. That's her story. She went through this amazing evolution, if you will. All right, we'll hear from the government. We'll hear from the government. Yes. The other guy over there. Thank you. Yeah. Is it disputed here that this woman went through an abortion? Yes, Your Honor. I believe it is. Oh, she didn't go through an abortion. Is that what you're saying? Well, the immigration judge, due to the record inconsistencies, the multiple record inconsistencies regarding her family planning-based claim, stated that he didn't know what to believe. And there are many inconsistencies in this case, Your Honor. Regarding the family planning-based claim, she was inconsistent about why she was allowed to wait four months between when. First of all, I don't think she was inconsistent. She was quite consistent, and I don't see what's wrong with the story. She said, as I understood it, that she was told to go to this class, and they were essentially, and her explanation was, well, they were hoping that I would just do it on my own. And I kept sort of leading them on to let them think I was, and I guess she was hoping she'd be far enough along that she'd either hide or somehow she'd be able to have the kid. But what's wrong with that? It seemed to me that it supported the contrary conditions information, which says that they are trying to not to do forcible abortions,  Yes, Your Honor. The response to that is that the immigration judge pointed to multiple variations of her story. When she was asked about why. Like what? Like what? Well, first, Your Honor, the first, she initially told the, when she was being cross-examined by DHS, she initially said that the family planning officials allowed her to wait until September to have her abortion because she was not visibly pregnant until August, and then she hid out at her cousin's house after that. Another variation of the story was that she told family planning officials that she would voluntarily have the abortion. And then her third variation of that story. Why is that inconsistent? Why is that inconsistent? Why is that inconsistent? Well, if you, in the hearing transcript, it's just the way she answered it. She changed her answer slightly every time she was answered. Was she speaking through an interpreter? Well, you know, this woman went through hell and, you know, she's trying to tell, does she speak English? My understanding was that she was speaking through an interpreter, Your Honor. Yeah, okay, and then there's always a loss when you go through an interpreter. Sure. Was there some other version of events that you think we should consider? Well, there's also different versions of different events. There's different versions of where she was when she was picked up by the family planning officials for her abortion. For example, in one telling of her story, she was hiding out at her cousin's house and they came to pick her up there. And another telling of the story. Where is that in the record? That is during her hearing transcript. Where? I believe I have the record over there. I can grab it for you, Your Honor, if you'd like, but I believe it's at. Okay, because the story I read was they came to the class and took her. So where is the other one? Yeah. Your Honor, the change is between her statement, her asylum statement. You mean the written? The written statement, yes, Your Honor. During the transcript. Okay, all right. So the written says what? The written statement says that she arrived at her workplace for her family planning class. And during her testimony, And I believe that starts at administrative record 219. I'm sorry, that starts at administrative record 224. You didn't say she arrived at her workplace for her family planning class. You said she arrived at her workplace family planning class. Yes, Your Honor, but the variation in the story is that she was at her cousin's house and then was taken to the family planning class. And then at some point in time during the testimony she was also told or she also said that she was picked up directly from her cousin's house. Okay, that's what I was asking you. Where is that? That is also during the hearing testimony. And we cited that in our brief, Your Honor. I know you said it four times. Just tell me where it is so I can look at it. You're being inconsistent. I'm sorry, Your Honor, I apologize. That's very helpful. She stayed at her cousin's home for a little over a month, and then she left because they found out she was pregnant. They informed the planning director. I'm on 111. And then she took a minivan and she took me to the municipal hospital. She actually didn't say they took her from the cousin's home. My understanding was that she was on the street by her cousin's house. Where does it say that? That's what we're looking for. No, she was on the street. I don't see why it says that. Or she was at her cousin's house. All right. Why don't you go ahead? I'm sorry, Your Honor, it is cited in my brief, though, or Arp Oil's brief. I mean, one of the problems here is that the IJ, it seems to me, did clearly misinterpret some of her testimony. He said that she said that they told her to have an abortion right away, and that's not what she said. She said they told her right away to have the abortion. And there was another place where he thought she said that she went to a class every day during a month rather than every day during the month that she was supposed to go to the class. So there was he seemed to be more reading her testimony against her as much as he could. And I'm wondering whether you're doing that now, too, because I can't find any place where it says that she was picked up from her cousin's house. Yes, Your Honor. Well, what I think is that the crux of his decision was that all of the inconsistencies viewed cumulatively undercut her credibility. But the crux of it, you see, this is what troubles me. And you might want to talk about the Fallon Gong stuff because in some ways the inconsistencies there may be stronger. But with regard to the forced abortion issue, his basic problem was that he thought there was something screwy about this story that they didn't make her have the abortions for three months. And that's just somebody imposing their outside view on what makes sense. It doesn't seem entirely screwy to me. Yes, Your Honor. I do understand your concern. But at the same time, like I said before, I think that just the cumulative effect of the inconsistencies relating to that claim and then later her Fallon Gong. So far we haven't actually come up with an inconsistency as to the abortion claim, have we? Well, yes, Your Honor. I believe that the variations of the story, although this Court has thought or believes that they are slight. We haven't seen a variation. What's the variation? Well, it's just the different ways she was, what she said about how she was able to avoid having this abortion for that period of time. I mean, like I said, the variation was that she was not visibly pregnant. Right. She wasn't visibly pregnant. She went to the classroom for a while. She then went and hid out. Then they came and got her so she couldn't hide out anymore. And by that time she was physically pregnant and they realized she hadn't had the abortion, so they gave her the abortion. What is contradictory about that? Well, I think, Your Honor, that the immigration judge viewed this as just an implausible claim. But now you're backing into something else. Right. But what's contradictory about her story? It's just the way the contradictions, I think, again, they just view cumulatively, I think, between the family planning-based claim and the Fallon Gong-based claim. But so far we don't have one in the family planning claims. Let's go on to the Fallon Gong claim. Okay. Yes, Your Honor. The inconsistencies in her Fallon Gong-based claim, Petitioner had particular trouble recalling the details of her alleged arrest. As the immigration judge pointed out, she seemed to confuse her statement about her second arrest and her testimony about her first arrest. In her testimony she didn't even mention her second arrest until asked about it on cross-examination. In particular, in her statement she claimed that she was beaten and interrogated during her second arrest, but during her testimony she claimed that she was beaten and interrogated during her first arrest. There also was a date inconsistency about when she- What I have here, that she testified she was arrested twice for her involvement with Fallon Gong. She testified during her first arrest. She was beaten during her first interrogation. And then in her written declaration attached to her asylum application, she didn't allege that she was beaten during the first arrest. Then on cross-examination she explained that she didn't mention the beating in her declaration because she thought the second arrest was more severe. And then the I.J., he puts himself in her shoes and determines that he thought someone in Dong's situation would include in her asylum application this information. So he imposed his own subjective view of what a persecuted person would include in her asylum application. And I don't think that has any place in an adverse credibility determination. He's just speculating. Well, Your Honor, he felt that it was unreasonable. Well, how did he know? Did he ever have an abortion? I do not believe so, Your Honor. Okay. All right. Let's say that we've seen a whole lot of these now. And at least on the abortion issue, this one seems to me to have more substance than most of the cases we've seen. I don't know whether you've seen many of them. We see a lot of these cases, Your Honor. I know you do.  You don't see as many as we do. But a lot of them seem very, particularly the ones where you have the men coming here to complain about their wives' abortions. But this one, you know, at least on that point, I mean, I really don't think you've come up with a contradiction. I mean, just to get to the crux of the Falun Gong one. Yes, Your Honor. The crux of the contradiction there, claim there, is that she left some things out of the ‑‑ in her written statement, she only mentions one arrest, and there were actually three when she testified. Is that the crux of it? The crux of it is the inconsistencies between, yes, Your Honor, the crux is the inconsistencies between her statement and what she admitted from her testimony. What are the ‑‑ is that the main inconsistency? The major inconsistency there is that she testified about a beating that she admitted from her first, or from her asylum statement, excuse me, and then later she did not testify about the beating that she wrote about in her asylum statement. Those are the big inconsistencies. I think, basically, Your Honor, that the immigration judge felt that Petitioner was confused by her arrest and was trying to memorize or recall a memorized story and not speaking from experience. Well, she had a lawyer there, didn't she? Yes, Your Honor, she did have a lawyer there. So what did this lawyer do? He just sat there and did nothing? Your Honor, Petitioner is not raised in ineffective assistance of counsel. Well, you know, it's all over the place, too. We've got to think about that as well. Yes, Your Honor. You know that as far as the Justice Department is concerned, a disbarred lawyer can practice before the immigration judge? I was not aware of that, Your Honor. Well, I'm telling you that. That's what they can do, see? And so we see a lot of these cases, and I think probably more than half of them that I see, and I watch these carefully, they've got lawyers that, you know, they just take their money and don't do much for it. So I don't know if I've checked this guy out or not, but if she'd had a decent lawyer, if she missed something, he would have called that to her attention. But he didn't. Your Honor, as far as I know, Petitioner's counsel, former counsel, has not been disbarred. But I do not know. As to the IJ, apparently faulted her on the Falun Gong largely because she didn't mention the second arrest and direct examination when asked if there was anything else that happened to her. Yes, Your Honor. But, in fact, that wasn't what happened. She wasn't asked if there was anything else that happened to her. Well, Your Honor, she was later asked on cross-examination, and then she brought it up for the first time, and I think that was what was troubling, that it wasn't brought up during direct examination. Because her attorney was asleep or he just had his mind on something else. In other words, she wasn't asked. She wasn't. Correct. Oh, I see what you're saying. Also, Your Honor, the testimony between, I guess the immigration judge's impression was that she was confusing the events. I mean, if you read her testimony and you read her statement, her testimony about her first arrest is parallel to her second arrest. I mean, she testified about her second arrest saying that she had her head smashed against the wall, she was hit with batons and handcuffed to a radiator, which is exactly what she said about her second arrest in her statement. There were some other inconsistencies regarding her Falun Gong claim. She had a date inconsistency about when she resumed practicing Falun Gong. Was it March or June 2000? She also testified inconsistently about how many times she was interrogated during her second arrest. In her statement, she said three times. On cross, she said two. In her explanation, the immigration judge found it was not reasonable that she only thought they were talking about interrogations that happened in a formal interrogation room. Your Honor, I see that I've gone over my— What's wrong with that? Well, Your Honor, the inconsistency is between the number of times. The answer is the immigration judge didn't find her explanation reasonable that she only thought they were talking about interrogations. When did they happen? Did those last two happen on the same day? That was not my understanding, Your Honor, but I'm not 100% sure. Counsel, before you leave, your brief cited 111 and 113 as the excerpts where we can find authority that she testified that she had the abortion while she was staying at her cousin's house. That's what you were looking for a minute earlier. But you also cite 107 and 108, and that's what I'd like you to turn to, as authority for her having had 107, 108, and 163, that she had it while she was at work. 163 indicates that she—the question was, when you were starting your plan in your classes, after you were brought back from your cousin's house, what day of the week were the classes? She goes on to answer the question about when she had the abortion. It's clearly after she came back from her cousin's home, right? But look at 107, 108, and this is what you're citing for us, and I want you to have an opportunity to respond. I think I— When they finally ask the question on 108, it says, where were you when you were indiscernible family planning director? And then she answers that she was at the class. But I can't tell—that could be when she was discovered she was pregnant, which is consistent with when they discovered she was pregnant. I mean, so now I don't only have the problem that there's the translation problem, but it seems to me that the essential question is, in the transcript, indicated as indiscernible. Your Honor, I—the record cites—I have the motion to reopen records, so I think we may have a different record here. All right. So when I look at your—I just looked at your brief, per your invitation, and I'm— Is this the first brief or the second brief? Because there's a brief in the 08 case and a brief in the 2010 case. The second brief. The second brief. Okay. And this is page 107 of the record? Right. Page 107 of my record is an article. Okay. Well, then, I guess we'll— So I apologize. That's all right. That's all right. If there's nothing further, Your Honor. All your inconsistencies are forgiven. I apologize, Your Honor. You know, what are you going to do now? Your Honor, if I can just refer to the record. In her original asylum statement on page 10 of the CAO—page 294 of the CAR, she says, In August 1998, I secretly went into shelter in my cousin's home for more than a month. Unfortunately, I was caught by the local family plan person, sent back to continue the family plan class. On the morning of September 15, 1999, I had just arrived at my workplace family plan class. Not workplace, family plan class. She was pulled into a vehicle, which was ready, by family plan director Fuzi Jin and staff. I was taken to Longjing City Hospital to induce the abortion. Then in her—that's her statement. In her testimony, she says, At that time, the local family—and this is on page 223 of the CAR— At that time, the local family planning community in my cousin's residential area found out I was pregnant. And what did they do? They informed the family planning director of my work unit, Fuzi Jin. And once your work unit director became informed, what was his response? She took a minivan, came over and took me. To where? To RNDGI, municipal hospital, to do the induced abortion. So that—her statement and her declaration are completely consistent. There is no inconsistency. I believe Your Honors have more than compelling reasons. More than compelling reasons to bring this on. One thing that is true, though, is that she's— at times says it's her cousin's house, and at other times says it's her father's house. Whether that's really what she said or whether there's a translation question, I don't know. But she does sort of vary between it was her father's house and her cousin's house. Your Honors, I am having trouble hearing you. At one point she says it's her father's house, and at other points she says— But she corrected that a number of times. I believe it was the interpreter. She corrected it over and over again. It's her cousin's house, not her father's house. That's all I have on her, Your Honor. Thank you very much. Thank you. Matter is submitted. Then Avazian v. Holder. That's the next matter on the calendar. That's submitted. And Cordes v. Countrywide Home Loans. That's submitted. And Stanley v. Baca. That's been removed from the calendar and will be heard at a later date. And now we come to O'Shea v. Epson, America. Thank you.
judges: Pregerson, Berzon, Christen